IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


CSX Transportation, Inc. and Norfolk Southern
Railway Company,

               Plaintiffs,

   v.

Columbus Downtown Development Corp. *et al.*,

               Defendants.

Case No: 2:16-cv-557

Judge Graham


Opinion and Order

The Scioto Greenways Project in downtown Columbus reshaped the Scioto River by removing the Main Street Dam and narrowing and deepening the river channel. Plaintiffs CSX Transportation, Inc. and Norfolk Southern Railway Company each operate two railroad tracks that run across a bridge spanning the Scioto River a few hundred feet downstream of where the Main Street Dam was located. Knowing that the Project would affect the river's flow, CSX and Norfolk entered into contractual arrangements in 2014 with defendant Columbus Downtown Development Corporation (CDDC). CDDC agreed to implement measures designed to protect the bridge's piers from "scour," or the erosion of sediment around the bridge's foundation.

Plaintiffs allege that they discovered in 2015 that the bridge had become unstable and shifted and that they spent $10 million to repair the bridge. Plaintiffs allege that CDDC and defendants Messer Construction Company (the construction manager at risk) and George J. Igel & Company (a subcontractor) are liable for the damage because they failed to properly implement the scour protection measures.

The filing of the complaint, which has been amended, triggered the filing of third-party complaints and numerous counter- and cross-claims against entities involved in the Project.

Pending before the court are five motions for judgment on the pleadings – two filed by third-party defendant Stantec Consulting Services, Inc. and three filed by Messer. These motions seek dismissal of certain indemnification and contribution claims brought against the movants.

1

## I.  Background

### A.  Relationships Among the Parties[1]

Prior to the start of the Project, CDDC contracted with Stantec to serve as the project engineer, as memorialized in a Professional Design Services Agreement of July 2, 2012.  (Doc. 82-1).  CDDC retained Stantec to complete geotechnical explorations and to conduct a hydraulic and scour analysis at the CSX bridge.  Stantec prepared a written report concerning river restoration and greenspace development along a 1.2 mile stretch of the Scioto River.  Stantec also provided design and engineering plans, which included bridge scour protection measures for the bridge.

Stantec entered into a Subconsultant Agreement with third-party defendant MSK2 LLC on July 6, 2012.  (Doc. 100-1).  MSK2 agreed to provide support and park design services in connection with the Project.  Stantec alleges that MSK2 prepared landscape designs which called for the removal of existing vegetation and for the planting of plants, shrubs and other vegetation throughout the Project's 1.2 mile stretch.  (Doc. 100 at PAGEID #1096, ¶ 18).

CDDC hired Messer in October 2012 to serve as the construction manager for the Project under a Standard Form of Agreement for Construction Manager at Risk (the "CM Agreement").  (Doc. 95 at PAGEID #1036, ¶ 9).

Messer in turn entered into a Subcontracting Agreement with Igel whereby Igel agreed to perform river channel excavation work and related services.  (Doc. 76-1).  Messer alleges that the Subcontracting Agreement required Igel to perform scour protection work at the bridge piers.  (Doc. 76 at PAGEID #701, ¶ 3).

It is alleged that Igel entered into some type of contract directly with CDDC.  (Doc. 98 at PAGEID #1049, ¶ 5).  Igel denies the existence of such a contract.  (Doc. 106 at PAGEID #1165, ¶ 1).  A copy of the alleged contract between Igel and CDDC is not on the record.

CSX and Norfolk have an agreement between themselves that CSX is the party responsible for maintenance and repair of the bridge.  (Doc. 70 at PAGEID #634, ¶ 24).

At some point, CSX retained third-party defendant STV Incorporated.  STV provided engineering services and reviewed Stantec's scour protection plans for CSX.  (Doc. 41 at PAGEID #187, ¶ 9).

---

[1]  The court's description of the parties' contractual arrangements is taken from the numerous pleadings that have been filed and the contracts attached to the pleadings.  However, the record does not contain every contract referenced in the pleadings.

On October 1, 2014, after the Main Street Dam had been removed, CSX entered into a Construction Agreement with CDDC. CSX granted a license to CDDC to access and cross the bridge and CDDC agreed to "[c]onstruct grouted riprap scour protections around [the] bridge piers." (Doc. 99-1 at PAGEID #1072). Section 1.1 of the Agreement provided that CSX had reviewed and approved of the various design plans prepared by Stantec. (Id. at PAGEID #1065). A schedule attached to the Agreement and signed by Messer provided that Messer would serve as CDDC's contractor to perform the work and would abide by the Agreement between CSX and CDDC. (Id. at PAGEID #1084).

In September and October of 2014, Norfolk entered into right of entry agreements with CDDC and with Messer, granting them access to Norfolk's lines on the bridge. (Doc. 99-2).

## B. The Parties' Claims

### 1. The Amended Complaint

According to the amended complaint, CSX discovered in April 2015 that the bridge "had shifted because it piers had settled and become unstable." (Doc. 70 at PAGEID #633, ¶ 21). CSX conducted an investigation, which led it to believe that "CDDC and its contractors failed to protect, and/or undermined the structural integrity of the Bridge." (Id. at ¶ 22). In order to keep the railroad tracks over the bridge in service, CSX had the bridge repaired and stabilized at a cost of $10 million. CSX demanded that CDDC and Messer pay the costs for the repairs, but they refused to do so.

The amended complaint asserts claims for breach of contract against CDDC and Messer. CSX alleges that CDDC and Messer, in breach of the Construction Agreement, either failed to install scour protection, installed it improperly, or otherwise compromised the integrity of the bridge. Norfolk alleges that CDDC and Messer, in breach of the Right of Entry Agreements, performed their work in a manner that interfered with Norfolk's rail operations. CSX and Norfolk also assert claims for contractual indemnification against CDDC and Messer. In the alternative, plaintiffs allege that CDDC's and Messer's negligence in performing work on the Project caused damage to the bridge.

Against Igel, plaintiffs assert a negligence claim alleging that Igel failed to properly install scour protection and left the bridge susceptible to damage in the course of dredging near the bridge.

CSX and Norfolk have also sued Cincinnati Insurance Company, from whom CDDC obtained Railroad Protective Liability insurance policies identifying CSX and Norfolk as named

insureds.  Plaintiffs allege that Cincinnati Insurance has breached the insurance policies by refusing to pay their claims.

## 2. Igel's Third-Party Complaint

Igel brings claims against Stantec, STV and MSK2.  (Doc. 74).  Igel denies that it was negligent in performing work on the Project.  It asserts that Stantec's designs and plans for scour protection were flawed and negligently prepared.  Igel further alleges that STV, having been retained by CSX to review Stantec's scour protection plans, performed its review services negligently and improperly approved of the plans.  As to MSK2, Igel alleges that its landscaping designs directed contractors to remove trees and shrubs which were growing from the base of the bridge piers and that removal of the trees and shrubs left holes which caused the bridge's foundation to shift or settle.  Igel alleges that the damage to the bridge was proximately caused by the negligent acts of Stantec, STV and MSK2.

Against each of these three parties Igel asserts a claim for implied indemnification.  Igel alleges that, to the extent it is found liable for any portion of the damage to the bridge, its actions were passive and secondary to the active and primary negligence of Stantec, STV and MSK2.  Igel also asserts claims for contribution against Stantec, STV and MSK2.

## 3. Messer's Claims

Messer brings crossclaims against Igel, Stantec and STV.  (Doc. 76).   Messer alleges that, to the extent it is found liable for the damage to the bridge, it is entitled to express indemnification under its Subcontracting Agreement with Igel.   Messer further asserts claims for implied indemnification and contribution against Igel, Stantec and STV, alleging that its actions were passive and secondary to the active and primary negligence of those parties.

Messer also brings crossclaims for implied indemnification and contribution against MSK2. (Doc. 90).

Messer has filed a third-party complaint Ohio Farmers Insurance Company.  (Doc. 77). Messer alleges that on December 11, 2013, Igel obtained a performance bond from Ohio Farmers, in accordance with the terms of Messer's Subcontracting Agreement with Igel.  Messer alleges that the terms of the bond imposed a surety obligation on Ohio Farmers.  Messer asserts claims for express and implied indemnification and contribution, alleging that Messer is entitled to recovery from Ohio Farmers as surety for Igel.

### 4.    CDDC's Crossclaims

CDDC brings a crossclaim against Stantec.  (Doc. 89).  CDDC alleges that it retained Stantec to prepare scour protection plans for the bridge but that Stantec did not exercise ordinary care in performing its professional design services.  CDDC alleges that Stantec failed to properly determine the impact of river flow on the piers and failed to design appropriate scour countermeasures.  CDDC asserts claims for professional negligence, breach of the Professional Design Services Agreement, contractual indemnification and contribution.

CDDC also brings a crossclaim against STV.  (Doc. 50).  It alleges that STV, upon reviewing Stantec's plans on behalf of CSX, recommended that certain changes be made, including using non-grouted riprap instead of grouted riprap.  CDDC alleges that the changes made by STV resulted in damage to the bridge, and it asserts claims for implied indemnification and contribution.

### 5.    Stantec's Claims

Stantec brings a crossclaim against Messer, alleging that the CM Agreement between CDDC and Messer contained an indemnity clause which obligates Messer to indemnify the "Indemnified Parties" for claims and damages arising in connection with the Project.  (Docs. 95).  Stantec asserts a claim for indemnification, alleging that it falls within the definition of "Indemnified Parties."

Stantec asserts crossclaims against MSK2.  (Doc. 100).  Stantec alleges that pursuant to their Subconsultant Agreement, MSK2 provided landscaping plans which directed contractors to remove trees and shrubs embedded in the bridge's piers.  Stantec alleges that removal of the plants created holes which caused the bridge's foundation to shift.  Stantec asserts claims for professional negligence, breach of the Subconsultant Agreement and contractual indemnification.

Stantec brings a counterclaim against CDDC.  (Doc. 111).  According to Stantec, the parties executed a modification of their Professional Design Services Agreement, providing that Stantec would receive $80,000 for performing additional services not contemplated by the Agreement.  Stantec asserts a claim for breach of contract, alleging that it performed the additional services but CDDC failed to pay it the amount due.

### 6.    MSK2's Crossclaims

MSK2 brings crossclaims against Messer and Igel.  (Docs. 97, 98).  As to Messer, MSK2 makes allegations and claims similar to what Stantec made.  MSK2 alleges that it is entitled to indemnification under the CM Agreement because MSK2 falls within the definition of "Indemnified Parties."  MSK2 asserts claims against Messer for indemnification and contribution.

As to Igel, MSK2 alleges that Igel entered into a contract with CDDC. This contract allegedly contains the same indemnity clause which appears in the CM Agreement between Messer and CDDC. MSK2 alleges that it is one of the "Indemnified Parties" under the contract between Igel and CDDC because it falls within the definition of MSK2 asserts claims for indemnification and contribution.

### 7. STV's Claims

STV brings a counterclaim against Igel and crossclaims against Messer and CDDC. (Doc. 41). STV denies that it was negligent in reviewing, on behalf of CSX, Stantec's plans for scour protection. STV alleges that, to the extent it is found liable for any part of the damage to the bridge, its actions were passive and secondary to the active and primary negligence of Igel, Messer and CDDC. STV asserts claims for implied indemnification and contribution against these parties.

STV has dismissed without prejudice crossclaims (doc. 41) that it had brought against Stantec for implied indemnification and contribution.

## II. Standard of Review

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to motions for judgment on the pleadings is the same standard applicable to motions to dismiss under Rule 12(b)(6). See Hindel v. Husted, 875 F.3d 344, 346 (6th Cir. 2017). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 582 (6th Cir. 2007) (internal citation and quotation marks omitted). However, the court need not accept as true legal conclusions or unwarranted factual inferences. Id. (citing Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999)).

To withstand a motion for judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III.    Stantec's Motions as to the Claims of Messer and Igel

Messer (Construction Manager at Risk) and Igel (Subcontractor) each assert claims for implied indemnification and contribution against Stantec (Project Engineer), based on the allegation that Stantec negligently prepared the scour protection plans which Messer and Igel followed during their work on the Project.

In its motions for judgment on the pleadings, Stantec makes arguments that apply equally to the claims of both Messer and Igel.

#### A.    Implied Indemnification

##### 1.    Elements of a Claim

"Indemnity arises from contract, either express or implied, and is the right of a person, who has been compelled to pay what another should have paid, to require complete reimbursement." Worth v. Aetna Cas. & Sur. Co., 32 Ohio St. 3d 238, 240, 513 N.E.2d 253, 256 (Ohio 1987). The party asserting an indemnification claim "seeks complete reimbursement from the party primarily liable for damages he or she has incurred." Wagner–Meinert, Inc. v. EDA Controls Corp., 444 F.Supp.2d 800, 804 (N.D. Ohio 2006).

An implied right to indemnification is recognized under Ohio law "in situations involving related tortfeasors, where the one committing the wrong is so related to a secondary party as to make the secondary party liable for the wrongs committed solely by the other." Reynolds v. Physicians Ins. Co. of Ohio, 68 Ohio St.3d 14, 16, 623 N.E.2d 30, 31 (Ohio 1993).

The indemnification claims of Messer and Igel incorporate two related concepts: the relationship of the parties and their relative fault. See Relizon Co. & Workflow Sols., LLC v. Seybold, No. 3:10-CV-145, 2014 WL 2939170, at *5 (S.D. Ohio June 27, 2014). "Ohio law generally recognizes that implied indemnification is appropriate in certain limited circumstances where a party owes only secondary legal responsibilities and is passively negligent." Mahathiraj v. Columbia Gas of Ohio, Inc., 84 Ohio App.3d 554, 563-64, 617 N.E.2d 737, 743 (Ohio Ct. App. 1992); accord Whitney v. Horrigan, 112 Ohio App.3d 511, 515, 679 N.E.2d 315, 317 (Ohio Ct. App. 1996); Lattea v. Akron, 9 Ohio App.3d 118, 122, 458 N.E.2d 868, 872 (Ohio Ct. App. 1982); Boyed v. Dana Inc., No. 3:16-cv-2609, 2017 WL 2720359, at *3 (N.D. Ohio June 23, 2017). See also 41 Am. Jur.2d Indemnity § 20.

## 2. Relationship of the Parties

"Secondary liability generally arises in situations, like vicarious liability, where a relationship exists between the tortfeasors that permits one tortfeasor to be held liable for the consequences of the other's actions." Mahathiraj, 84 Ohio App.3d at 564, 617 N.E.2d at 743. Relationships which have been found to meet this standard include: wholesaler and retailer, abutting property owner and municipality, independent contractor and employer, and master and servant. Reynolds, 68 Ohio St.3d at 16, 623 N.E.2d at 31.

As Stantec points out, neither Messer nor Igel allege having with Stantec one of the relationships listed in Reynolds. Even so, "no case states that this list is exhaustive." Mills v. River Terminal Ry. Co., 276 F.3d 222, 226 n.4 (6th Cir. 2002). The list simply provides "examples" of relationships which may give rise to an implied contract of indemnification. Id. (citing Cochran v. Baltimore & Ohio R. R. Co., 41 Ohio App.2d 186, 188, 324 N.E.2d 759, 761 (Ohio Ct. App. 1974)). The key to the right of implied indemnification is not having a relationship on the list but having a relationship in which the tortfeasors owe a common duty to the injured party – a point the court will discuss further below. Id. at 227 (citing cases where Ohio courts have found a right of indemnification "between parties that do not share a relationship in the list").

Stantec argues that the connection between it and the other two parties is tenuous. Stantec prepared scour protection plans for the Project, in which Messer and Igel were also involved, but Stantec did not have direct dealings with those parties. Stantec relies on Waverly City Sch. Dist. Bd. of Educ. v. Triad Architects, Inc., No. 08AP-329, 2008 WL 5423269 (Ohio Ct. App. Dec. 30, 2008). The Waverly school district and the Ohio School Facilities Commission (OSFC) agreed to co-fund and co-own a project to construct new school buildings. The school district entered into a Professional Design Services Agreement with Triad Architects, Inc. to design and construct HVAC systems for the project. Triad retained National Engineering, Ltd. to perform certain design services. After the new buildings opened, the coils in the HVAC systems froze and the school district and OSFC sued Triad for breach of contract and professional negligence. Triad filed a third-party complaint against National for breach of contract and indemnification. National then filed claims for indemnification against the school district and OSFC, alleging that the school district was negligent in maintaining and operating the HVAC systems and that OSFC was negligent in making a change to National's design.

The appellate court in Waverly held that National failed to state a claim for indemnification against the school district and OSFC. It found, without further elaboration: "National's only

relationship to OSFC and Waverly is as Triad's subcontractor . . . . We find no authority for concluding that the tenuous relationships between the parties here are sufficient to create an implied contract of indemnity. Any liability that National may incur arises not as a result of any relationship to the alleged wrongdoers, but by virtue of National's contractual relationship with Triad." Waverly, 2008 WL 5423269 at *9.

Stantec likens Messer and Igel to the subcontractor, National, in Waverly. Stantec emphasizes that it, like the school district and OSFC, did not have a direct relationship with the parties seeking indemnification. According to Stantec, Messer and Igel did not perform work on Stantec's behalf or under Stantec's control.

The court finds Stantec's argument to be unpersuasive. In Waverly, the court rejected an indemnification claim brought by a subcontractor against the project's owners, who suffered injury when the coils froze. Here, Messer and Igel are not asserting claims against CSX, which suffered injury when the bridge shifted, but against Project Engineer Stantec. As alleged in the pleadings, Messer's and Igel's exposure to liability arises from their use of, and adherence to, Stantec's scour protection designs.[2] In contrast, National did not allege that it relied on OSFC's change to the HVAC plans; rather, National alleged that OSFC made a subsequent change to National's "original HVAC system design." Waverly, 2008 WL 5423269 at *2.

One Ohio court, after surveying the case law regarding the relationship required to impose a duty to indemnify, observed that "in all of them the uniting thread is the existence of a common duty toward or a common goal affecting the injured party shared by two or more persons of entities not otherwise acting in concert or in pari delicto." Cochran v. Baltimore & Ohio R. R. Co., 41 Ohio App.2d 186, 189, 324 N.E.2d 759, 761-62 (Ohio Ct. App. 1974). See also Maryland Cas. Co. v. Frederick Co., 142 Ohio St. 605, 612-13, 53 N.E.2d 795, 798 (Ohio 1944). "These are situations where two or more parties, not in pari delicto, nevertheless share a common duty toward the injured party, or are combined in some degree or form to achieve a common purpose affecting the injured

---

[2] Stantec argues that Messer and Igel have not alleged that they relied on Stantec's plans. The court, however, finds that the pleadings support a reasonable inference that Messer and Igel followed Stantec's plans. Messer alleges that Stantec created "plans and specifications" for excavation and for riprap scour protection and that Messer's work in connection with the Project "complied with all its obligations, including plans and specifications." (Doc. 76 at PAGEID #705, ¶ 11). Igel admitted in its answer that its contract with Messer required it to perform work "in accordance with" the documents "prepared by Stantec." (Doc. 17-3 at PAGEID #98; Doc. 36 at PAGEID #167, ¶ 2). And Igel alleges that Stantec prepared the plans for bridge scour protection. (Doc. 74 at PAGEID #683, ¶¶ 8-9).

party." Id., 41 Ohio App.2d at 188, 324 N.E.2d at 761.  Implied indemnification has thus been defined as "the right of a person who is only secondarily liable to recover from the person primarily liable for proper expenditures paid to a third party injured through the violation of their common duties." Lattea, 9 Ohio App. 3d at 122, 458 N.E.2d at 872. See also Potter v. Havlicek, No. 3:06-cv-211, 2008 WL 2556723, at *9 (S.D. Ohio June 23, 2008) (stating that if two tortfeasors "do not share a common duty toward or common goal affecting the injured party, their acts are independent and neither has a right to contribution or indemnification from the other"); Pierce v. Norfolk & S. Ry. Co., No. 1:05-cv-0190, 2005 WL 1114437, at *2 (N.D. Ohio May 9, 2005) (stating that the primary and secondary tortfeasors must owe "a common duty to the injured party").

Although the court in Waverly did not explain its holding in terms of a common duty, the case illustrates the dividing line Ohio law creates in determining whether a right of implied indemnification arises.  In Waverly, the parties from whom National sought indemnification – the school district and OSFC – were also the injured parties.  It would have been nonsensical to speak of National sharing a common duty with the school district and OSFC to the injured parties.  As the court in Waverly pointed out, National's exposure to liability did not arise because of its relationship to the alleged primary tortfeasors, but because of its contractual arrangement with Triad.

Here, by contrast, the pleadings allege the existence of relationships from which one can reasonably infer that Messer and Igel shared a common duty or goal with Stantec.  Each party was hired to work on the Scioto Greenways Project, and specifically to provide scour protection for the CSX bridge.  CDDC retained Stantec as the Project Engineer to conduct a hydraulic and scour analysis of the river and to prepare scour protection plans for the bridge.  CDDC then hired Messer as the Construction Manager at Risk to deliver the Project, including implementing Stantec's scour protection plans.  Messer in turn hired Igel as a subcontractor to perform scour protection work at the bridge piers in accordance with Stantec's plans.  Thus, the pleadings sufficiently allege that Stantec, Messer and Igel had a common duty and a shared goal of providing scour protection to the bridge for the benefit of the injured parties, CSX and Norfolk.

Stantec also relies on Reynolds, 68 Ohio St.3d at 16, 623 N.E.2d at 31-32, but that case too illustrates why the alleged relationships in this case are sufficient to support a claim.  In Reynolds the parents of a newborn infant sued an obstetrician and a pediatrician for medical malpractice.  The obstetrician's medical malpractice insurer asserted an indemnification claim against the pediatrician. The Ohio Supreme Court rejected the claim because the two physicians owed "separate and distinct" duties to the patient.  68 Ohio St.3d at 16, 623 N.E.2d at 32.  The obstetrician was

responsible for delivering the infant, while the pediatrician was responsible for post-birth care. "They acted independently of one another and are, therefore, responsible only for the results of their own negligence, if negligent at all." Id.

Stantec argues that it cannot be liable to indemnify Messer and Igel simply because each participated in the Project, much like the physicians in Reynolds did not owe a common duty merely because both "were on the scene" and provided care to the infant. Stantec asserts that Messer and Igel acted independently of Stantec in performing work on the Project.

The court disagrees. The pleadings allege that Messer, Igel and Stantec each had specific and interrelated involvement in providing scour protection for the bridge. That is, Messer's and Igel's indemnification claims do not rest on their participation in the Project as a whole – the Project, after all, was broad in its scope. Rather, the claims rest on the parties' particular work on the same scour protection measures: Stantec designed them, Messer agreed to put them into place and Igel constructed or installed them. It is alleged that, unlike the physicians in Reynolds, Messer and Igel were not working independently of Stantec but were relying on and complying with Stantec's plans.

Accordingly, the court finds that the pleadings sufficiently allege the existence of a relationship whereby Messer and Igel have a right of indemnification against Stantec.

### 3.  Relative Fault

In order to prevail, the party seeking indemnification must also be no more than passively negligent. Mahathiraj, 84 Ohio App.3d at 563-64, 617 N.E.2d at 743. Ohio case law does not define "passively negligent," but courts attempt to provide meaning to the term by juxtaposing it with "actively negligent." "Primary liability exists when one is actively negligent or has actual knowledge of a dangerous situation and acquiesces in the continuation thereof." Whitney, 112 Ohio App.3d at 515, 679 N.E.2d at 317 (citing Mahathiraj, 84 Ohio App.3d at 564, 617 N.E.2d at 743-44); see also Indiana Ins. Co. v. Barnes, 165 Ohio App.3d 262, 267-68, 846 N.E.2d 73, 77 (Ohio Ct. App. 2005); Lingo v. Ohio Cent. R.R., No. 05AP-206, 2006 WL 1230679, at *9 (Ohio Ct. App. May 9, 2006).

The terms actively and passively negligent continue to be used even though one court observed four decades ago that they "inexactly and unhelpfully" characterize the underlying legal principle. Cochran, 41 Ohio App. 2d at 189, 324 N.E.2d at 761. The underlying principle is this: a right of indemnification exists where the secondary party becomes liable to a third person for "failing to discover or to remedy" the harm caused by the primary party's negligence or misconduct. Ohio Fuel Gas Co. v. Pace Excavating Co., 187 N.E.2d 89, 91-93 (Ohio Ct. App. 1963) (examining

the Restatement of the Law on Restitution and Ohio Jurisprudence on Indemnity and Contribution).

Another court, conceding that its attempt to define "passively negligent" was "far from perfect," described the term as "a person's failure to act" where that person did not know of a dangerous condition of which it had a duty to correct. Goscenski v. Ohio Dep't of Transp., No. 13AP-585, 2014 WL 3867533, at *5 n.3 (Ohio Ct. App. Aug. 7, 2014). The court gleaned this definition after examining the fact patterns from early Ohio Supreme Court cases.[3] Id., 2014 WL 3867533, at **2-3. See also Velsicol Chem. Corp. v. Rowe, 543 S.W.2d 337, 339 (Tenn. 1976) (referring to passive negligence as a "mere failure to remedy or discover the negligence").

It has been said that the party seeking indemnity must be "without personal fault for the acts committed by [the primary] wrongdoer." Allstate Ins. Co. v. U.S. Assocs. Realty, Inc., 11 Ohio App.3d 242, 246, 464 N.E.2d 169, 173 (Ohio Ct. App. 1983) (citing 18 Ohio Jurisprudence 3d 464, Contribution, Indemnity, Etc., Section 96 (1980)); see also Wills Trucking, Inc. v. Baltimore & Ohio R.R. Co., No. 97-4067, 1999 WL 357775, at *3 (6th Cir. May 14, 1999) (using the term "innocent actor" relative to the primary tortfeasor); 41 Am. Jur.2d Indemnity § 20 (right to indemnity arises when the "party seeking indemnification is blameless and the other party is at fault."). Thus, the "right to recover indemnity for proper expenditures made by a person who has become vicariously and secondarily liable for the unauthorized and wrongful conduct of another is limited to a person who has not actively participated in such conduct." Massachusetts Bonding & Ins. Co. v. Dingle-Clark Co., 142 Ohio St. 346, 346, 52 N.E.2d 340, 340-41 (Ohio 1943).

If the party seeking indemnification is a joint tortfeasor with the alleged primary party, then the two parties "are both chargeable with actual negligence" and "[i]ndemnification is not allowed." Reynolds, 68 Ohio St.3d at 16, 623 N.E.2d at 31-32. That is, "where two parties actively participate in the commission of a tort, they are joint tortfeasors and no right of indemnification exists between the two." Whitney, 112 Ohio App.3d at 515, 679 N.E.2d at 317. See also Nature's One, Inc. v. Spring Hill Jersey Cheese, Inc., No. 2:15-cv-2820, 2017 WL 4349065, at *3 (S.D. Ohio Sept. 29,

---

[3] The court in Goscenski went on to criticize the active/passive negligence theory as not being "consonant with the modern world of comparative negligence" and as being unnecessary in light Ohio's contribution statute. Goscenski, 2014 WL 3867533, at *4. The court, nonetheless, found that the early case law authority "remains valid law" and that it was "bound to follow the law as set forth by the Supreme Court." Id. at **3, 5.

Further, it should be noted that the contribution statute provides, "This section does not impair any right of indemnity under existing law." O.R.C. § 2307.25(D).

2017) ("Spring Hill could not recover on its indemnification claim if both it and WD Logistics were negligent; Spring Hill must establish WD Logistics' negligence [and] that it has been imputed to Spring Hill.").

Here, Messer and Igel deny that they were negligent in the work they performed on the scour protection measures for the bridge. They only followed the plans and specifications prepared by Stantec, who allegedly breached the applicable standard of care in performing its design services and prepared plans which failed to provide for adequate and appropriate scour countermeasures. (Doc. 74 at PAGEID #683, ¶ 9; Doc. 76 at PAGEID #705, ¶ 6). Though Messer and Igel became potentially liable to CSX and Norfolk because of the work they performed in implementing the scour protections, they allege that it was Stantec's flawed plans which caused the damage to the bridge. The court finds that these allegations support an inference that Messer and Igel were passively negligent (in the sense of failing to discover or remedy the flaws in the plans) and that Stantec was the true party at fault. See Pierce, 2005 WL 1114437 at *2 (secondary liability arises where the primary and secondary tortfeasors owe a common duty to the injured party but the secondary party does not commit the act or omission causing the injury).

Attempting to escape this conclusion, Stantec argues that the court should disregard the allegations of Stantec's negligence as being conclusory. It is true that the pleadings do not go into great detail concerning what exactly Stantec did wrong in its plans. But in a case where at this early stage none of the various parties pretend to fully know the precise cause or causes of the alleged damage to the bridge, Messer and Igel have provided "a short and plain statement" sufficient to give Stantec fair notice of their claims and the grounds on which they rest – namely that its designs and plans failed to adequately protect the bridge against scour. Fed. R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Finally, Stantec cites Mosser Constr., Inc. v. W. Waterproofing Co., No. L-05-1164, 2006 WL 1944934 (Ohio Ct. App. July 14, 2006), for the proposition that a contractor who agrees to accept responsibility for its subcontractors cannot be merely passively negligent. In Mosser, the State of Ohio hired an architecture firm (Munger) to design a new building for a medical college. Munger's design's included plans for a trench drain. The State hired a lead contractor (Mosser) to construct the building in accordance with Munger's design. Mosser in turn hired a subcontractor (Western Waterproofing) to install a membrane lining in the trench drain.

Water and mold were found inside the building after it was completed. To resolve the medical college's claims against it, Mosser spent $1 million to rebuild the trench drain. Mosser then

sued Munger for implied indemnification. On summary judgment, and after "months of investigation into the water leaks," the court found no dispute of fact that the water infiltration had been caused by faulty design, faulty construction and an improperly installed membrane lining. Mosser, 2006 WL 1944934, at *4. The court, noting that Mosser's contract with the State made Mosser responsible for its own work and for the work of its subcontractor, found that Mosser had participated in the wrongdoing through its own faulty construction and through Western Waterproofing's improper installation. Id. at *5. The court thus held that Mosser could not be passively negligent and granted summary judgment to Munger. Id.

Stantec's reliance on Mosser is premature. Though Stantec may be able to prove after discovery that the negligent conduct of Messer and Igel caused damage to the bridge, the pleadings of Messer and Igel deny any negligence on their part.

Accordingly, Stantec's motions for judgment on the pleadings are denied as to the indemnification claims of Messer and Igel.

### B. Contribution

#### 1. The Ability to Assert a Contingent Claim

Messer and Igel both plead, in the alternative, claims for contribution against Stantec. Stantec argues that the claims must be dismissed as unripe because Messer and Igel have not "paid" any amounts to CSX or Norfolk. Ohio's contribution statute provides in part:

> [I]f one or more persons are jointly and severally liable in tort for the same injury or loss to person or property or for the same wrongful death, there may be a right of contribution even though judgment has not been recovered against all or any of them. The right of contribution exists only in favor of a tortfeasor who has *paid* more than that tortfeasor's proportionate share of the common liability, and that tortfeasor's total recovery is limited to the amount paid by that tortfeasor in excess of that tortfeasor's proportionate share.

O.R.C. § 2307.25(A) (emphasis added).

When previously confronted with the same argument as Stantec makes – that "a right of contribution or indemnity does not accrue until after one party has paid more than its fair share" – this court found that the issue "is governed by Fed. R. Civ. P. 14(a)." New Mkt. Acquisitions, Ltd. v. Powerhouse Gym, 154 F.Supp.2d 1213, 1227-28 (S.D. Ohio 2001). That is, while Ohio law grants a substantive right to contribution, federal law governs the procedure of asserting a claim in federal court. Erie R.R. v. Tompkins, 304 U.S. 64 (1938).

Igel asserts a third-party claim for contribution. Under Rule 14, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or *may be liable* to it for all

or part of the claim against it." Fed. R. Civ. P. 14(a) (emphasis added). Similarly, Messer asserts a crossclaim for contribution under Rule 13, which provides that the crossclaim "may include a claim that the coparty is or *may be liable* to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant." Fed. R. Civ. P. 13(g) (emphasis added).

Rules 13 and 14 serve the purpose of promoting judicial economy by adjudicating, in a single action, multiple claims arising from the same set of facts. New Mkt., 154 F.Supp.2d at 1228 (citing Tate v. Frey, 735 F.2d 986, 989 (6th Cir. 1984)); see also Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co., 512 F.3d 800, 805 (6th Cir. 2008); United States v. Snider, 779 F.2d 1151, 1157 (6th Cir. 1985). These Rules "are remedial and are construed liberally. Both Rules 13 and 14 are 'intended to avoid circuity of action and to dispose of the entire subject matter arising from one set of facts in one action, thus administering complete and evenhanded justice expeditiously and economically.'" Lasa Per L'Industria Del Marmo Societa Per Azioni v. Alexander, 414 F.2d 143, 146 (6th Cir. 1969) (quoting Blair v. Cleveland Twist Drill Co., 197 F.2d 842, 845 (7th Cir. 1952)).

In light of the "may be liable" language of Rules 13(g) and 14(a), courts have long held that parties may plead a "claim of a contingent nature, the ultimate outcome of which depends upon the determination of other features or issues in the case." Providential Dev. Co. v. U.S. Steel Co., 236 F.2d 277, 281 (10th Cir. 1956) (discussing Rule 13(g); see also Andrulonis v. United States, 26 F.3d 1224, 1233 (2d Cir. 1994) (holding that Rule 14(a) "permits a defendant to bring in a third-party defendant even though the defendant's claim is purely inchoate – i.e., has not yet accrued under the governing substantive law – so long as the third-party defendant may become liable for all or part of the plaintiff's judgment"). This allows for a person or entity, "who is or may be liable to" a defendant for all or part of the plaintiff's claim against the defendant, to be retained in the action "while the underlying determination of liability is decided." New Mkt., 154 F.Supp.2d at 1228.

As Wright and Miller state regarding Rule 14(a):

> If the governing substantive law recognizes a right of contribution, impleader under Rule 14 is a proper procedure by which to seek relief from joint tortfeasors. The availability of impleader enables the right of contribution to be litigated concurrently with the main claim. . . . Moreover, it is not critical that state substantive law does not recognize a right to contribution until the original defendant has paid more than his pro rata share. Any judgment on the third-party claim does not become enforceable until after the common liability has been discharged by the original defendant. Impleader under Rule 14 merely accelerates the determination of liability and does not have the effect of enlarging any substantive rights.

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 6 Fed. Prac. & Proc. Civ. § 1448 (3d ed. 2010) (footnotes omitted).

> Similarly, Wright and Miller state regarding Rule 13(g):

> [T]he crossclaim provision does not require that the claim be mature at the time of pleading. On the contrary, subdivision (g) specifically provides that a crossclaim can be brought if the party against whom it is asserted "is or may be liable to the crossclaimant for all or part" of plaintiff's claim. The use of the words "may be" exactly parallels the language of Rule 14(a), so that as is true of third-party claims, a crossclaim can be contingent upon the ultimate adjudication of the crossclaimant's liability to plaintiff.

Id. at § 1431(footnotes omitted).

Stantec cites a different decision from this court, <u>Mill's Pride, L.P. v. Miller Salvage, Inc.</u>, No. 2:07-cv-990, 2008 WL 1848196, at *8 (S.D. Ohio Apr. 23, 2008) (Smith, J.), in which the court dismissed as "premature" a counterclaim for contribution. The court reasoned that the right to contribution under Ohio law "does not ripen" until the party seeking contribution has paid more than his proportionate share of liability. Id.

The decision in <u>Mill's Pride</u> is not persuasive for two reasons. First, the decision did not acknowledge the published authority of <u>New Market</u> or of another district court, applying Ohio law, reaching the same result as <u>New Market</u>. <u>See</u> <u>Ohio Sav. Bank v. Manhattan Mortg. Co.</u>, 455 F.Supp.2d 247, 254 (S.D.N.Y. 2006) (holding that Rule 14 allows a contribution claim to be asserted in federal court even if the claim has not accrued under Ohio law).

Second, the <u>Mill's Pride</u> decision relied on <u>Midwest Specialties, Inc. v. Crown Indus. Prod. Co.</u>, 940 F.Supp. 1160, 1168 (N.D. Ohio 1996), but that case stands for a somewhat different proposition. In <u>Midwest</u>, the court granted summary judgment to two defendants, ICI and PPG, in a products liability action. Those defendants had brought contribution counterclaims against an insurance company. The court, noting that contribution cannot be enforced until there is a payment satisfying the underlying obligation, dismissed the contribution claims: "Since the Court has granted both ICI's and PPG's motions for summary judgment, neither party will pay any damages. The right to contribution, therefore, will not arise." Id. Thus, the posture of the case was not a dismissal of the contribution claims at the outset of the litigation on the basis that claims were not ripe. Rather, the court dismissed those claims only after determining as a matter of law that the contribution plaintiffs were not liable for the underlying injury.

In <u>New Market</u> the court found, "A defendant may implead a party, even though a cause of action has not yet accrued, provided the claim is contingent upon the success of plaintiff's claim, and

will accrue when defendant is found liable in the main action." New Mkt., 154 F.Supp.2d at 1228 n.13 (citing Community Fed. Sav. & Loan Ass'n v. Transamerica Ins. Co., 559 F.Supp. 536, 537 (E.D. Mo. 1983) ("The fact that defendant is not yet 'out of pocket' is not fatal to his third-party complaint.")). This position comports with the vast weight of authority finding that, even when "the right to contribution does not arise in favor of the defendant unless and until the defendant pays the plaintiff an amount exceeding its equitable share" of liability, "Rule 14(a) nevertheless permits a defendant to implead a joint tortfeasor for contribution before the right to contribution accrues, because that third party 'may be' liable to the defendant for a share of the plaintiff's primary judgment." Andrulonis, 26 F.3d at 1233.[4]

The court accordingly finds that Messer and Igel may assert claims for contribution in this action.

### 2.    Allegations of Joint Wrongdoing

The right of contribution exists only when parties are "jointly and severally liable in tort for the same injury." O.R.C. § 2307.25(A). Stantec contends that the contribution claims should be dismissed because Messer and Igel each have failed to adequately allege they were jointly and severally liable with Stantec.

Joint and several liability arises when the negligence of two or more persons either combine or concur to produce a single indivisible injury. Schindler v. Standard Oil Co., 166 Ohio St. 391, 394, 143 N.E.2d 133, 136 (Ohio 1957); Wery v. Seff, 136 Ohio St. 307, 311, 25 N.E.2d 692, 694 (Ohio 1940). A joint tortfeasor is "one who actively participates, cooperates in, requests, aids,

---

[4]  See, e.g., Providential Dev., 236 F.2d at 281; Glens Falls Indem. Co. v. U.S. ex rel. Westinghouse Elec. Supply Co., 229 F.2d 370, 375 (9th Cir. 1955) ("[A] pleading of payment was not required because of the provisions in Rules 13 and 14."); Wada v. Aloha King, LLC, 154 F. Supp.3d 981, 1003 (D. Haw. 2015) (Rule 13(g) "does not require that the indemnification or contribution claims be mature at the time of pleading"); Rossi v. Wohl, 633 F.Supp.2d 270, 275 (N.D. Tex. 2009); Ohio Sav. Bank, 455 F.Supp.2d at 254; Essex Builders Group, Inc. v. Amerisure Ins. Co., 429 F.Supp.2d 1274, 1289 (M.D. Fla. 2005); Pouliot v. Paul Arpin Van Lines, Inc., 303 F.Supp.2d 135, 138-39 (D. Conn. 2004); Oneida Indian Nation of New York v. New York, 194 F.Supp.2d 104, 143 (N.D.N.Y. 2002); Glaziers & Glassworkers Union Local 252 Annuity Fund v. Newbridge Secs., Inc., 823 F.Supp. 1188, 1190 (E.D. Pa. 1993); Patten v. Knutzen, 646 F.Supp. 427, 430 (D. Colo. 1986); Rambone v. Critzer, 548 F Supp. 660, 663 (W.D. Va. 1982); Walker v. Axalta Coating Sys., LLC, No. 14-2105-JAR, 2015 WL 685834, at *4 (D. Kan. Feb. 18, 2015); CBR Funding, LLC v. Jones, No. 1:13-cv-1280, 2015 WL 12857355, at *2 (W.D. Tenn. Jan. 15, 2015); Netzer v. Union Carbide Corp., No. WDQ–14–1589, 2014 WL 5587040, at *3 n. 15 (D. Md. Oct. 31, 2014); Dejana v. Marine Tech., Inc., No. 4:11-cv-1690, 2013 WL 1282327, at *2 (E.D. Mo. Mar. 26, 2013).

encourages, ratifies, or adopts a wrongdoer's actions in pursuance of a common plan or design to commit a tortious act." <u>Clevecon, Inc. v. Northeast Ohio Regional Sewer Dist.</u>, 90 Ohio App.3d 215, 223, 628 N.E.2d 143, 148 (Ohio Ct. App. 1993) (citing Prosser, Law of Torts § 46 at 292 (4th Ed. 1978)). Concurrent negligence refers to "the negligence of two or more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury." <u>Snowden v. Ekeh</u>, 67 N.E.3d 1255, 1269 (Ohio Ct. App. 2016) (internal quotation marks omitted).

The court finds that the pleadings contain sufficient factual allegations to support the contributions claims of Messer and Igel. Again, Messer and Igel deny negligence on their part. But they allege that if they are found to be liable to CSX and Norfolk – who claim that Messer and Igel negligently performed scour protection work on the bridge – then their liability should be shared by Stantec, who provided them with flawed scour protection plans. These allegations support a plausible inference of joint and several liability – that Messer and Igel participated in, cooperated with or adopted Stantec's actions pursuant to a common plan, or that Messer and Igel performed negligent work which combined with Stantec's negligent plans to produce a single injury to the bridge.

Accordingly, Stantec's motions for judgment on the pleadings are denied as to the contribution claims of Messer and Igel.

## IV.    Messer's Motions as to the Indemnification Claims of Stantec and MSK2

Stantec (Project Engineer) and MSK2 (a subconsultant for Stantec) each assert crossclaims for contractual indemnification against Messer (Construction Manager at Risk). They allege that the Construction Manager at Risk Agreement between CDDC and Messer contains an Indemnification Clause by which Messer agreed to indemnify all "Indemnified Parties" for claims and damages arising in connection with the Project. Stantec and MSK2 further allege that the term "Indemnified Parties" is defined to include the "Architect/Engineer" and other "consultants." (Doc. 95 at PAGEID #1037, ¶¶ 11-12; Doc. 97 at PAGEID #1044, ¶¶ 9-10).

Neither Stantec nor MSK2 allege that they were parties or signatories to the CM Agreement. Messer contends that they must therefore show they were intended third-party beneficiaries in order to enforce the terms of the Agreement. They cannot do so, according to Messer, because the Agreement contained a separate provision, entitled "No Third-Party Interest," expressing the intent of Messer and CDDC that no outside party have an enforceable interest in the Agreement.

The court begins by noting that the CM Agreement is not a part of the record at this stage. Stantec and MSK2 did not attach it to their crossclaims; Messer did not attach the Agreement to its answers. See Fed. R. Civ. P. 7(a); Fed. R. Civ. P. 10(c). Each of Messer's motions for judgment on the pleadings state that the Agreement is attached to the motion, but it is not. Stantec attached to its response brief a standard form document that Stantec says is a copy of the Agreement. (Doc. 119-1). But the attached document is unsigned and undated, and Stantec has not otherwise established that the document is a true and accurate copy of the CM Agreement.

That being said, the document submitted by Stantec contains a No Third-Party Interest Clause whose language matches the language on which Messer relies in its motions for judgment on the pleadings. See Robins v. Global Fitness Holdings, LLC, 838 F.Supp.2d 631, 642 (N.D. Ohio 2012) (on a Rule 12(b)(6) motion, considering an unauthenticated copy of a contract, which was central to the complaint, where neither side questioned the validity or accuracy of the document). The No Third-Party Interest Clause provides as follows:

> Except as expressly provided under Section 6.2.2 through 6.2.4 and Section 12.10.2, (1) no person or entity, other than the Contracting Authority and CM, will have any right or interest under the Contract, and (2) the Contract does not create a contractual relationship of any kind between any people or entities other than the Contracting Authority and the CM.

CM Agreement, § 12.14. The Agreement elsewhere identifies the Contracting Authority as CDDC and the CM as Messer. (Doc. 119-1 at PAGEID #1299).

The Indemnification Clause on which Stantec and MSK2 rely provides as follows:

> To the fullest extent permitted by Applicable Law, the CM shall indemnify, defend, and hold harmless the Indemnified Parties from and against all claims, costs, damages, losses, fines, penalties, and expenses . . . arising out of or in connection with the Project, provided that any such claim, cost, damage, loss, fine, penalty, or expense (excluding consequential damages incurred by the Indemnified Parties) is attributable to:
>
> bodily injury, sickness, disease, or death, or to injury or destruction of tangible property but only to the extent caused by the negligent acts, errors, or omissions of the CM or a person or entity for whom the CM may be liable;
>
> . . . .

CM Agreement, § 10.6.1. "Indemnified Parties" is elsewhere defined as:

> The City of Columbus, the Contracting Authority, the A/E [Architect/Engineer], other Separate Consultants, and their respective officials, officers, consultants, agents, representatives, and employees in both individual and official capacities.

(Doc. 119-1 at PAGEID #1289).

A third person to a contract cannot enforce the contract unless he is an "intended beneficiary," as opposed to an "incidental beneficiary." Huff v. FirstEnergy Corp., 130 Ohio St.3d 196, 200, 957 N.E.2d 3, 6 (Ohio 2011); Hill v. Sonitrol of Southwestern Ohio, Inc., 36 Ohio St.3d 36, 40, 521 N.E.2d 780, 784 (Ohio 1988). Courts use an "intent to benefit" test to determine if a third person is an intended beneficiary:

> [A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Hill, 36 Ohio St.3d at 40, 521 N.E.2d at 784 (adopting Restatement of the Law 2d, Contracts, Section 302 (1981)). The mere conferring of a benefit on a third person by performance does not make him an intended beneficiary; the parties must express their intent to benefit the third person. Hill, 36 Ohio St.3d at 40, 521 N.E.2d at 784 (quoting Norfolk & Western Co. v. United States, 641 F.2d 1201, 1208 (6th Cir. 1980)). See also TRINOVA Corp. v. Pilkington Bros., P.L.C., 70 Ohio St. 3d 271, 278, 638 N.E.2d 572, 577, *order clarified*, 71 Ohio St. 3d 1202, 640 N.E.2d 1144 (Ohio 1994) ("There must be evidence that the promisee assumed a duty to the third party.").

In applying the intent to benefit test, the court should look first to the parties' expression of intent "in the language of the agreement." Huff, 130 Ohio St. 3d at 200, 957 N.E.2d at 7. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions." Id. (internal quotation marks omitted).

Here, the CM Agreement seems to contain conflicting provisions regarding the contracting parties' intent to benefit third parties. The Indemnification Clause expressly imposes a duty on Messer to indemnify the Indemnified Parties against all claims, damages and losses in connection with the Project when those claims, damages and losses are caused by Messer's negligence. See CM Agreement, § 10.6.1. Other subparagraphs in the Indemnification Clause refer to this duty as the "CM's indemnification obligation" to the Indemnified Parties. See id. at §§ 10.6.2 to 10.6.7. The

No Third-Party Interest Clause meanwhile contains a much different expression of the parties' intent regarding third parties. It states that, with exceptions not applicable here, no third person or entity will have any right, interest or contractual relationship under the Agreement. Id., § 12.14.

Stantec and MSK2 argue that the Indemnification and No Third-Party Interest provisions are irreconcilable. They contend that the conflict must be resolved by giving priority to specific contractual language over general language. See Monsler v. Cincinnati Cas. Co., 74 Ohio App.3d 321, 330, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991) ("A fundamental principle of contract construction requires that the document be read as a whole in order to identify the intent of the parties. A specific provision controls over a general one."). In their view, the No Third-Party Interest Clause is akin to a general, boilerplate disclaimer, while the Indemnification Clause imposes a specific obligation on Messer to indemnify third parties involved in the Project.

Before selecting one provision to trump the other, Messer believes the court should attempt to interpret the Agreement in a way which gives meaning to both clauses. See R.L.R. Invests., L.L.C. v. Wilmington Horsemens Grp., L.L.C., 2014-Ohio-4757, ¶ 20, 22 N.E.3d 233, 240 (Ohio Ct. App. 2014) ("The court's construction of a contract should attempt to harmonize all the provisions of the document rather than to produce conflict in them. . . . A contract should also be construed so as to give effect to all of its provisions.") (citations omitted). Messer contends that one potential construction is that the Indemnification Clause is enforceable only by CDDC, who could demand indemnity on behalf of any third party covered by the provision. In the alternative, Messer argues that the No Third-Party Interest Clause should trump the Indemnification Clause because it provides a specific statement of the contracting parties' intention not to benefit third parties.

The court finds that it is unable to resolve these interpretative issues at this stage. It is well settled that "[i]n determining the intent of the parties, the court must read the contract as a whole and give effect to every part of the contract, if possible." Beasley v. Monoko, Inc., 195 Ohio App. 3d 93, 103, 958 N.E.2d 1003, 1011-12 (Ohio Ct. App. 2011). The court cannot say that it has the whole contract before it. Not only is the copy on the record unsigned and undated, but the court observes that the record contains several other contracts at issue in this lawsuit which are accompanied by contemporaneous writings, including addendums, amendments, exhibits, forms, meeting notes, riders and schedules. Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth., 78 Ohio St. 3d 353, 361, 678 N.E.2d 519, 526 (Ohio 1997) ("[A] writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole."). The unsigned copy of the CM

Agreement does not have such accompanying materials, but it is plausible that the executed Agreement in fact does. The court is unwilling to declare what the CM Agreement means as a matter of law when it is not assured that it has the whole Agreement before it.

But even if having the whole Agreement would fail to shed further light on the parties' intentions regarding third parties, the court finds that Messer, the movant, has not shown that it is entitled to judgment on the pleadings. Messer's theory that the Agreement can be reasonably interpreted to mean that only CDDC can enforce the indemnity obligation is not well-developed or supported in the briefs. (Doc. 132 at PAGEID ##1459-60) (citing cases that do not support the theory). It is not apparent to the court how it would be reasonable to interpret the Agreement as leaving the indemnification rights of all Indemnified Parties to the mercy of CDDC. Messer does not argue that CDDC, which had direct contractual relationships with other entities, including Stantec, separately agreed with any of the Indemnified Parties to enforce their rights.

Nor has Messer carried its burden as to the argument that the No Third-Party Interest Clause should prevail over the Indemnification Clause because it provides a more specific statement of the contracting parties' intention. Stantec and MSK2 have presented an equally plausible position from the pleadings that the Indemnification Clause is the more specific provision. Each clause contains an express statement of the parties' intentions – first, that Messer promises "to the fullest extent permitted by the law" to indemnify the Indemnified Parties, and then, that no third party has a right or interest arising from the Agreement. The court is not convinced that the canon of contract interpretation relied upon by the parties will be what decides this dispute.

Finally, Messer cites Walls, Inc. v. Atlantic Realty Co., 186 Ga. App. 389, 367 S.E.2d 278 (Ga. Ct. App. 1988), as an example of a court choosing to enforce a "no third-party interest" clause over an indemnification clause. In Walls building owner Atlantic asserted an indemnification claim against Walls based on a subcontract between general contractor Beers and subcontractor Walls to install drywall. The subcontract did not contain an indemnification clause, but it did incorporate by reference a general contract between Atlantic and Beers. The general contract provided that Beers would indemnify Atlantic and that, as added protection for Atlantic, Beers would procure agreements from its subcontractors to indemnify Atlantic (which Beers failed to do with Walls). The court found that the subcontract incorporated the general contract's provision that subcontractors would agree to indemnify Atlantic. Walls, 186 Ga. App. at 391-92, 367 S.E.2d at 280. However, in determining whether Atlantic was an intended third-party beneficiary to the subcontract, the court found that the incorporated indemnity clause was trumped by the express

language Beers and Walls used in the subcontract to state that there would be no third-party beneficiaries:

> [T]he subcontract specifically provides that Beers and Walls "agree . . . [t]his subcontract is *solely* for the benefit of the signatories hereto." Atlantic was not a signatory to the subcontract. Only Beers and [Walls] were. It follows that, under the express terms of the subcontract, Atlantic cannot be considered a third-party beneficiary of any indemnity provision . . . . The intent of the parties to this particular subcontract was to the effect that no others benefit from it and this intent could scarcely have been more clearly expressed.

Id., 186 Ga. App. at 392, 367 S.E.2d at 281 (emphasis in original).

What makes the case at hand distinguishable from Walls is that the "no third-party interest" language here is directly counterbalanced by an indemnification clause in the same contract. That is, the competing evidence of the parties' intent does not come indirectly or strained through incorporation by reference; rather, the evidence appears expressly in the language they agreed to.

Accordingly, Messer's motions for judgment on the pleadings are denied as to the indemnification claims of Stantec and MSK2.

## V. Messer's Partial Motion as to CSX's and Norfolk's Indemnification Claims

### A. Does Indemnification Cover Claims Between the Contracting Parties?

CSX and Norfolk have asserted claims for contractual indemnification against Messer. CSX alleges that its Construction Agreement with CDDC and Messer contained an indemnification clause whereby CDDC and Messer agreed to indemnify CSX for all property damage arising from the negligence or misconduct of CDDC, Messer or their contractors. See CSX Construction Agr. at § 11.1. Norfolk alleges that its Contractor Right of Entry Agreement with Messer contained a provision whereby Messer agreed to indemnify Norfolk for all property damage arising from the presence of Messer and its subcontractors on or near the bridge. See Norfolk Right of Entry Agr. at ¶ (v). CSX and Norfolk allege that CDDC, Messer and their subcontractors caused the damage to the bridge.

Messer argues that the indemnity provisions are triggered only when a claim or demand is made by an injured third party against CSX or Norfolk. Messer points out that the complaint does not allege that any third party has made a claim against plaintiffs. In response, plaintiffs argue that the provisions are worded broadly enough to cover not only third-party claims but also claims between the parties themselves for damages suffered directly by CSX and Norfolk.

As Messer notes, this issue came before the court in <u>Mead Corp. v. ABB Power Generation Inc.</u>, 141 F.Supp.2d 914 (S.D. Ohio 2001) (Graham. J.), *aff'd in part, rev'd in part*, 319 F.3d 790 (6th Cir. 2003). There, the indemnity clause was broadly worded and not specifically limited to third-party claims. The court did not find any controlling case law on the issue of whether an indemnity provision applies to disputes between the contracting parties, and it found a conflict in the case law outside of Ohio: some jurisdictions adhered to the traditional understanding of indemnity as applying to only third-party claims, while some held that when parties choose broad language, courts should enforce their agreement and apply indemnity provisions to claims between the contracting parties. <u>Mead</u>, 141 F.Supp.2d at 921-22 (citing cases). The court then looked to other provisions of the parties' contract and found a limitation of liability clause in which the parties referred to "third party claims . . . for which Seller may be liable subject to [the] Indemnity Article." <u>Id</u>. at 920. The court held that this language established the parties' intent to limit the indemnity obligation to third-party claims.[5] <u>Id</u>. at 922. The court therefore granted summary judgment to the defendant on plaintiff's claim for indemnification.

On appeal, the Sixth Circuit affirmed this court's grant of summary judgment but employed different reasoning. The Sixth Circuit found that the limitation of liability clause did no more than create an ambiguity concerning the scope of the indemnity clause – it did not conclusively establish that the parties intended to limit the indemnity clause to third-party claims. <u>Mead</u>, 319 F.3d 798 ("[T]he contract as a whole can be read consistently either to allow or disallow indemnity claims for Mead's direct losses caused by ABB Power's negligence."). The court then held that under Ohio law, ambiguous language must be construed against the drafter of the contract. Because plaintiff drafted the contract, the court resolved the ambiguity in favor of defendant. <u>Id</u>. at 798-99.

The Sixth Circuit in <u>Mead</u> declined to resolve the issue of whether an indemnity clause applies to claims between the contracting parties under Ohio law. <u>Id</u>. at 798 n.3. The parties here have not cited, nor has the court found, any Ohio cases since <u>Mead</u> which have addressed the issue. One federal district court has held that indemnification is not limited to third-party claims, though it relied on another federal district court decision, <u>Battelle Mem'l Inst. v. Nowsco Pipeline Servs.</u>, 56 F.Supp.2d 944 (S.D. Ohio 1999), with which this court stated its disagreement in <u>Mead</u>. Pay(q)r,

---

[5] The court further found that a broad reading of the indemnity clause would have eviscerated the warranty provision of the contract. <u>Id</u>. at 922. The indemnification claim was in substance the same as a claim for breach of warranty, and the warranty provision stated that it was an "exclusive" remedy. <u>Id</u>.

LLC v. Sibble, No. 5:15-cv-1038, 2015 WL 9583034, at **12-13 (N.D. Ohio Dec. 31, 2015); see Mead, 141 F.Supp.2d at 921 ("In Battelle, the court did not cite any Ohio or Sixth Circuit case that explicitly held that indemnity provisions apply to disputes between the contracting parties.").

## B.     The CSX Construction Agreement

Applying the Sixth Circuit's holding in Mead to the case at hand, the court finds that Messer, at this early stage, has not demonstrated as a matter of law that the CSX Construction Agreement is ambiguous regarding the scope of the Indemnification Clause. The Clause provides:

> To the maximum extent permitted by applicable law, Agency [CDDC] and its Contractors [Messer] shall indemnify, defend, and hold CSXT [CSX Transportation] and its affiliates harmless from and against all claims, demands, payments, suits, actions, judgments, settlements, and damages of every nature, degree and kind (including direct, indirect, consequential, incidental, and punitive damages), for any injury [to a person] . . . [and] for the loss of or damage to any property whatsoever (including but not limited to property owned by or in the care, custody, or control of CSXT, its affiliates, Agency or its Contractors . . .), arising directly or indirectly from the negligence, recklessness or intentional wrongful misconduct of the Contractors, Agency, and their respective agents, employees, invitees, contractors, or its contractors' agents, employees or invitees in the performance of work in connection with the Project or activities incidental thereto, or from their presence on or about CSXT's property.

CSX Construction Agr., at § 11.1. This language is broad and appears to cover payments made by CSX for damage to CSX's property arising from Messer's negligence in performing work on the Project.

Messer argues that the court, as it did in Mead, should look to other language in the contract in considering how to interpret the scope of the Indemnification Clause. Messer contends that construing the provision broadly would render meaningless the Cost of Project Reimbursement Clause, under which CDDC agreed to reimburse CSX for certain costs and expenses. See CSX Construction Agr. at § 4. If CSX can recover its expenses for repairing the bridge through indemnification, then what purpose does the Cost of Project Reimbursement clause serve, Messer asks.

Messer's argument rests on an untenable reading of the Cost of Project Reimbursement Clause. That provision covers anticipated costs related to the Project and are specifically identified as being in the nature of travel, lodging, telephone, mailing, equipment, tools, supplies, labor, and out-of-pocket expenses. See CSX Construction Agr. at § 4.1. The Clause does not speak to damage to property arising from CDDC's or Messer's negligence.

Messer's next argument likewise fails.  Messer contends that the notice provision of the Indemnification Clause – requiring Messer to notify CSX of any injury or damage arising out of the Project – would be rendered superfluous under CSX's theory because there is no need to notify CSX of an injury to itself, of which it already must know.  <u>See</u> CSX Construction Agr. at § 11.4.  This argument overlooks the possibility that CSX might suffer injury of which it would not immediately be aware; i.e., Messer's negligence could cause property damage which would otherwise take CSX some time to discover.

Accordingly, Messer's partial motion for judgment on the pleadings is denied as to CSX's indemnification claim.

### C.      The Norfolk Right of Entry Agreement

The court reaches a different conclusion when applying the Sixth Circuit's holding in <u>Mead</u> to Norfolk's Contractor Right of Entry Agreement.  The Agreement contains the following provision whereby Messer agrees:

> to indemnify and save harmless Company [Norfolk], its officers, agents and employees from and against any and all claims, demands, losses, suits, judgments, costs, expenses (including without limitation reasonable attorney's fees) and liability resulting from . . . injury to or death or any person . . . and damage to or loss of any property, including without limitation that belonging to or in the custody of Licensees [Messer and its subcontractors], arising or in any manner growing out of the presence of either the Licensees or the Licensee Property, or both, on or about the Premises, regardless of whether negligence on the part of Company, its officers, agents or employees causes or contributed to said loss of life, personal injury or property loss or damage in whole or in part.

Norfolk Right of Entry Agr. at ¶ (v).

As an initial matter, this provision lacks certain language that helped give the CSX Agreement its broad sweep.  It does not include "payments" within its scope.  Nor does it expressly encompass damage to property "owned by or in the care, custody, or control of" the railroad company.

Moreover, Messer argues that the "regardless" proviso at the end of the paragraph demonstrates the parties' intent to limit the Indemnification Clause to third-party claims.  Messer contends that it would be nonsensical for Messer to be obligated to indemnify Norfolk for injury or damage to Norfolk regardless of whether Norfolk negligently caused the loss.[6]

---

[6]   In contrast, the CSX Agreement is not susceptible to a reading that would have CSX being indemnified for the results of its own negligence because the duty to indemnify is limited to losses arising from the negligence of CDDC, Messer or their contractors.

Norfolk has not offered a direct response to Messer's argument, but simply argues that the wording of the Indemnification Clause is broad. The court agrees with Messer that the "regardless" proviso makes sense only in the context of third-party claims – that Messer agreed to indemnify Norfolk for injury or damage to third parties even if Norfolk caused or contributed to the injury or damage. To include direct injuries to Norfolk within the scope of the Indemnification Clause in essence would require Messer insure Norfolk against itself. But there is no suggestion anywhere in the Right of Entry Agreement that its purpose or scope included obligating Messer to indemnify Norfolk for self-inflicted harm.

The court finds that the Indemnification Clause is ambiguous at best. Even if the first part of the Clause can be read to cover claims between the contracting parties, the "regardless" proviso supports the narrower interpretation that Norfolk cannot seek indemnity for damage to itself. It is undisputed that Norfolk is the drafter of the Agreement, which bears Norfolk's name and file identifier at the top of the first page. Resolving the ambiguity in favor of Messer, the court finds that the Indemnification Clause must be interpreted to exclude claims between the contracting parties. See Mead, 319 F.3d at 798-99.

Accordingly, Messer's partial motion for judgment on the pleadings is granted as to Norfolk's indemnification claim.

## VI. Conclusion

For the reasons stated above, the following motions for judgment on the pleadings are DENIED: Stantec's motion as to Igel's third-party complaint (doc. 93); Stantec's motion as to Messer's crossclaims (doc. 94); Messer's partial motion as to Count I of MSK2's crossclaim (doc. 112); and Messer's motion as to Stantec's crossclaim (doc. 113).

Messer's partial motion for judgment on the pleadings (doc. 99) is DENIED as to CSX's indemnification claim and GRANTED as to Norfolk's indemnification claim.

The Clerk of Court is instructed to terminate the following motions for judgment on the pleadings as moot: Stantec's motion as to Igel's fourth party complaint (doc. 45); Stantec's motion as to STV's crossclaims (doc. 58); and Stantec's motion as to Messer's crossclaims (doc. 67).

s/ James L. Graham
JAMES L. GRAHAM
DATE: March 26, 2018                                    United States District Judge