# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CSX TRANSPORTATION, INC, et al.,**

    **Plaintiffs,**

  v.                                     Civil Action 2:16-cv-557
                                            Judge James L. Graham
                                            Magistrate Judge Jolson

**COLUMBUS DOWNTOWN**
**DEVELOPMENT CORPORATION, et al.,**

    **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff CSX Transportation Inc.'s ("CSX"), Plaintiff Norfolk Southern Railway Co.'s ("NS"), Third-Party Defendant STV Incorporated's ("STV"), and Third-Party Defendant Santec Consulting Services, Inc.'s ("Santec") (collectively "Movants") Motions to Compel Production of Documents of Defendant George J. Igel & Co., Inc. ("Igel"). (Docs. 239, 240, and 242). Plaintiffs CSX and NS move to compel production of the following: (1) audio recordings of witness statements that Igel is withholding on the basis of work-product, and (2) documents responsive to discovery requests Igel has admitted it has in its possession, but has failed to produce. (Doc. 239-1 at 1). STV and Santec move to compel production of the audio recordings of witness statement that Igel is withholding and each incorporate, by reference, the section of CSX and NS's Memorandum in Support arguing that the audio recordings must be produced. (Doc. 240 at 1, 3; Doc. 242 at 1, 3). Accordingly, the Court will address Movants' Motions to Compel the audio recordings from Igel as one. For the following reasons, Movants' Motions (Docs. 239, 240, and 242) are **GRANTED.**

## I. BACKGROUND

This lawsuit arises out of construction work completed by several contractors in connection with the Scioto Greenways Project (the "Project"), the details of which the Court has discussed elsewhere. (*See generally* Doc. 153). CSX and NS claim they sustained damage to a railroad bridge used by both companies (the "Bridge") resulting from the Project. (Doc. 252 at 3). In connection with the Project, Igel was retained to perform certain excavation work and lay riprap scour protection in the vicinity of the Bridge piers. (*Id.*). Movants represent that "[a] key issue in this litigation is what work was performed around the bridge by Igel and how that work was performed." (Doc. 239-1 at 2). Movants state that Igel employees Bryce Shaw, Tony Tomaro, and Steve Ashworth performed the excavation work around the Bridge, and Rick Delozier was in charge of the Igel employees working around the Bridge. (*Id.* at 3).

Movants seeks production of audio recordings of interviews with Igel employees Mr. Tomaro, Mr. Shaw, and Mr. Delozier. They learned of these audio recordings from the deposition testimony of Mary So, Igel's Director of Safety and Employee Development, and John Igel, president of the company. (*Id.*). Both parties cite excerpts of Ms. So's deposition (Docs. 239-3 and 250-1 ("So Dep.")) and Mr. Igel's deposition (Docs. 239-4 and 250-2 ("Igel Dep.")) to support their arguments that the audio recordings are or are not discoverable. In brief, Movants represent that during Ms. So's deposition, she "was questioned about the audio recordings and testified they were obtained at the request of the president of the company, John Igel, and that it was part of Igel's routine practice to record interviews with relevant employee-witnesses." (Doc. 239-1 at 3). Igel characterizes the Bridge investigation differently and argues that it was not a routine

2

investigation or otherwise used for any internal business purpose. (Doc. 250 at 3–6). These differing views are at the core of this dispute.

According to her deposition testimony, Ms. So regularly performs investigations incident to her position. (So Dep. at 19:17–21). Her investigations can be initiated in a number of ways but, typically, they come from the safety department, primarily by employees calling a reporting line. (*Id.* at 20:14–23). She conducts approximately one thousand investigations per year. (*Id.* at 21:5). These investigations concern personal injury, property damage, environmental incidents, and equipment damage. (*Id.* at 21:6–11). Her investigation process depends on the incident; usually, she reviews the information reported and may then ask questions to the foreman, investigate the individual's training, go to the scene to take pictures or measurements, and determine the individual that would most appropriate to address the incident. (*Id.* at 22:21–23:6). When investigating, Ms. So gathers information including who was involved, witnesses, equipment numbers, and other information appropriate to the incident. (*Id.* 27:17–24). If follow-up is needed, Ms. So or someone in her department will speak with witnesses to gather additional information and sometimes take notes on or record what is said. (*Id.* at 31:1–23). The vast majority of her investigations are very simple and are handled quickly; others may go on for several weeks. (*Id.* at 35:1–5). Ms. So's "intent behind most of the investigation[s] is to establish what the cause was and prevent reoccurrence." (*Id.* at 35:8–10). Following an investigation, Ms. So discusses her findings and makes available any documentation to operations, the superintendent, and management. (*Id.* at 35:17–36:3). Ms. So reports completed investigations to Mr. Igel. (*Id.* at 36:4–10).

On various occasions, Ms. So was asked to obtain information regarding the Project and

the Bridge. (*Id.* at 36:11–18). Unlike her other investigations, however, this was not initiated by an employee calling the reporting line. (*Id.*). Instead, Mr. Igel personally asked her to investigate after he received a letter that Igel could be accused of some type of wrongdoing in its work on the Project.[1] (*Id.* at 36:19–37:6). Igel represents that it "only began an investigation relating to the [Bridge] after being put on notice by other parties that the Plaintiffs were likely to make a claim relating to the settlement of the Bridge." (Doc. 250 at 4). Ms. So testified as follows:

> Q. Okay. All right. Now, do you recall doing an incident investigation when the southern rail bridge settled during the Scioto Greenways Project?
>
> A. On various opportunities, I was requested to obtain information. The Scioto Greenways discussion was not turned in as an incident by any employee.
>
> Q. Who requested you to obtain information?
>
> A. John Igel.
>
> Q. When did he make that request?
>
> A. After receiving a letter, he just put me on notice. I had a conversation with him to find out if we were being accused of something. At that point, he just wanted me to be aware. And in subsequent weeks, when more information began to come out, I was asked to go on-site and try and determine who were the employees related to the work in the water.

(So Dep. at 36:11–37:6). Ms. So conducted the interviews in the presence of another Igel employee, Chris Schleicher. (*Id.* at 40:20–24). Ms. So described her discussion with Mr. Deloizer as follows:

> Q. What did you ask Mr. Delozier during that interview?
>
> A. I told him that we were in receipt of a letter another party had received alleging that there was a problem with the bridge. I asked him if he was aware. I asked him if there was anything to indicate that there was a problem. I asked him about his work on the -- you know, as superintendent, had he been out there? I asked him to

---

[1] Igel's briefing uses the term "letter," but Igel submitted only an email as an exhibit. Accordingly, the Court understands Igel to be referring to this email when it says "letter."

4

confirm, were there any other operators that we should be talking to? And he said the primary excavation in the river had taken place with Tony and Greg.

(*Id.* at 46:3–15).

Mr. Igel did not disagree that the purpose of the investigation and the recordings was to prevent reoccurrence and capture details "while fresh." (Igel Dep. at 73:10–14). Specifically, Mr. Igle testified:

> Q: So as the president of the company, you have the investigation done to determine what happened and to prevent it from recurring and you never listened to the audio [recordings of Tomaro, Shaw or Delozier]?
>
> A: That's what I stated, yeah.
>
> . . .
>
> Q: [T]he idea of the investigation was to prevent reoccurrences from happening again. What was the product of the investigation?
>
> A: Well, it was also to gain the facts and while they were fresh in everybody's mind and to document those, and so she did that with those recordings and placed them in a file.

(Igel Dep. at 74:10–14; 101:20–102:4). Igel asserts that the recordings were not used for any internal business purpose but, instead, were sent directly to Igel's insurance adjuster. (Doc. 250 at 6). When asked "[w]hat did you do with the recording of this conversation with Mr. Tomaro[,]" Ms. So replied, "I saved it on our NDrive at work, and I transferred it to our insurance adjuster." (So Dep. at 41:4–7).

Igel also argues that the context surrounding the interviews underscores they were made in contemplation of potential litigation. Ms. So explained that she "participated in internal strategy sessions. [I]n my quarterly meetings, I have to review open claims, so it was discussed, and I assisted to respond to interrogatories or questions to obtain things for our attorneys." (*Id.* at 49:4–

5

9). These meetings were not at the request of counsel, but were Igel's regular operations and scheduling meetings. (*Id.* at 54:15–19). Ms. So recalls the following from the meeting after receipt of the letter that Igel asserts put it on notice of the possibility of Plaintiff's claims:

> The conversation was related to the fact that we'd received notice, but we weren't aware of any details. Nothing had been furnished directly to Igel. Mostly, things had been passed through the hands of different parties. So we were trying figure out if the there was a claim, if we were on notice of – to stop or what was being asked.
>
> Q. Okay. And what was decided at that meeting in terms of what was being asked and if there was a claim?
>
> A. There was going to be a meeting on-site with CDDC and Messer and Igel, and my understanding was they were hoping to get an individual from the railroad present to find out what allegation was being made, to get more clarification to the letter.

(*Id.* at 55:20–56:12). Igel argues that the following excerpt of Mr. Igel's deposition testimony reinforces Ms. So's:

> Q. So there was an investigation that was conducted with respect to the bridge piers sinking, correct?
>
> A. There was.
>
> Q. And did - - was that - - did you initiate that or was Mary So initiating that?
>
> A. We probably worked together on it, realizing we should start understanding what happened while it was still fresh in everybody's mind. I'm sure we had a discussion about it.
>
> Q. Part of the purpose of that is, of course, to find out what happened and, you know, prevent reoccurrence, correct?
>
> A. Yeah. And get the facts while they were fresh.
>
> Q. Is it fair to say that there was no - - you were not instructed by an attorney to do that; this was part of what you guys normally do in this kind of situation, correct?

A. I'm sure we had an incident and we know it was - - in the large category. And I'm sure we served notice to our insurance carrier, and I'm not sure of the cascade of all the conversations specifically after that, but …

. . .

Q. I mean, the idea of the investigation was to prevent occurrences from happening again. What was the product of the investigation? If any.

A. Well, it was also to gain the facts and - - while they were fresh in everybody's mind and to document those, and so she did that with those recordings and placed them in the file. If Mary wrote something up, I'm sure it - - you know, I'm sure if she did or didn't, so . . .

Q. You just don't know, right?

A. I don't.

(Igel Dep. at 72:21–73:20; 101:20–102:8). John Igel testified that he had not personally listened to the recordings. (*Id.* at 74:14).

Igel states that the first correspondence with CSX in its file, an email sent by Amanda DeCesare of CSX to Guy Worley and Matt Lutz of Columbus Downtown Development Corporation, alluded to the possibility of litigation. (Doc. 250 at 8). That email read as follows:

Mr. Worley, Mr. Lutz,

Please be advised that CSX's bridge over the Scioto River has experienced issues with one of the piers shifting. The track itself has been affected by this and has impacted train traffic over the bridge. CSX is currently investigating the situation to determine the cause of the pier shift. I am notifying you because the Scioto Greenways project is in the immediate vicinity of this bridge. Should CSX's investigation determine that the pier shift was caused by the Scioto Greenways project, I will contact you again.

Thank you,
Amanda J. DeCesare

(Doc. 250-3). This email was forwarded to Tim Gusler at Messer, who in turn forwarded it to Mr. Igel on April 9, 2015. (*Id.*). Igel represents that Mr. Igel forwarded the email to Ms. So before he

7

instructed her to investigate the incident. (Doc. 250 at 9).

## II. STANDARD

According to Rule 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Determining the proper scope of discovery falls within the broad discretion of the trial court." *Gruenbaum v. Werner Enter., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citing *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)).

"On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). The moving party bears the burden of demonstrating relevance. *Gruenbaum*, 270 F.R.D. at 302 (citation omitted). "If the movant makes this showing, then the burden shifts to the non-movant to show that to produce the information would be unduly burdensome." *Ball v. Kasich*, no. 2:16-CV-282, 2018 U.S. Dist. LEXIS, at *17 (S.D. Ohio Nov. 29, 2018) (citation and internal quotations omitted).

## III. DISCUSSION

### A. Work Product

Igel argues that the work-product doctrine protects the audio recordings from discovery. The work-product doctrine is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure:

> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
>   (i) they are otherwise discoverable under Rule 26(b)(1); and

8

> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3). "Under the Federal Rules, the work product protection under Rule 26(b)(3) is not limited to attorneys, but has been extended to documents and tangible things prepared by or for the party and the party's representative, as long as such documents were prepared in anticipation of litigation." *Shah v. Metro. Life Ins. Co.*, No. 2:16-cv-1124, 2017 U.S. Dist. LEXIS 194347, at *8 (S.D. Ohio Nov. 27, 2017) (citations omitted).

The Sixth Circuit has adopted the "because of" test to determine whether a document was prepared in anticipation of litigation. *Boltz*, 2017 U.S. Dist. LEXIS 102913, at *10. The test asks: "(1) whether a document was created because of a party's subjective anticipation of litigation, as contrasted with an ordinary business purpose, and (2) whether that subjective anticipation of litigation was objectively reasonable." *Id.* (quoting *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006)). Accordingly, the party asserting work-product must "prove that anticipated litigation was the driving force" behind the preparation of the disputed document. *Id.* (citations omitted). The prospect of future litigation cannot be "remote." *Jones v. St. Jude's Med. S.C., Inc.*, No. 2:08-cv-1047, 2011 U.S. Dist. LEXIS 21426, at *13 (S.D. Ohio Mar. 3, 2011). If the document was created as part of the ordinary business of a party, and the ordinary business purpose was the "driving force" or impetus for creation of the document, then it is not protected by the work-product doctrine. *Id.* (citing *Roxworthy*, 457 F.3d at 595); *see also Love v. Sears, Roebuck & Co.*, NO. 3:13-CV-402, 2014 U.S. Dist. LEXIS 33141, at *2 (W.D. Ky. Mar. 14, 2014) ("If a document

would have been prepared in substantially the same manner irrespective of the anticipated litigation, the work product privilege does not apply.") (citations and quotations omitted); *Graff v. Haverhill N. Coke Co.*, No. 1:09-cv-670, 2012 U.S. Dist. LEXIS 162013, at *12 (S.D. Ohio Nov. 13, 2012) ("Thus, we have held that materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3).").

As noted, the parties dispute why Ms. So investigated, and the resolution of that dispute determines whether work-product protection is triggered. Importantly, it is Igel's burden to establish "that anticipated litigation was the driving force" behind the preparation of the audio recordings. *Boltz*, 2017 U.S. Dist. LEXIS 102913, at *10.

For their part, Movants assert that Ms. So's "ordinary business conduct, in her role as Safety Director, is exactly what took place here and led to creation of the audio recordings." (Doc. 239-1 at 7). Movants' argument rests on the fact that Ms. So investigates up to one thousand incidents per year, most of which are to prevent the relevant incident from occurring again—an ordinary business purpose—and in those investigations she sometimes takes audio recordings like those at issue here. Put simply, Movants view Ms. So's investigation of the Project as routine.

Igel responds with a couple of key facts. First, Igel notes that Mr. Igel, not an employee, initiated the investigation, and he did so because he received notice of potential wrongdoing related to the settlement of the Bridge. (*See* Doc. 250-3). Thus, the genesis of this particular investigation was out of the ordinary. Case law makes clear that even if an employee, like Ms. So, regularly investigates incidents for business reasons, a report prepared by that employee may be work-product if the party seeking protection presents evidence of "an overt act, statement, or other

concrete facts to support a reasonable, and subjective anticipation of litigation." *See Love*, 2014 U.S. Dist. LEXIS 33141, at *6 ("[T]he Sears policy to anticipate litigation and prepare a report is not substitute for the actual anticipation of litigation under the facts and circumstances of each case.") (citations and internal quotations omitted).

Second, after the audio recordings were created, Igel did not use them for any internal purpose. Following an investigation, Ms. So ordinarily discusses her findings and makes available any documentation to operations, the superintendent, and management. (So. Dep. at 35:17–36:3). In the normal course, Ms. So also reports completed investigations to Mr. Igel. (*Id.* at 36:4–10). That is not what happened here. Instead of following that process, Ms. So transferred the audio recordings to the company's insurance adjuster. (*Id.* at 41:4–7).

Although a close call, Igel has met its burden. Igel has shown that Ms. So's investigation was not initiated in the regular course; instead, anticipation of litigation was the driving factor behind the creation of the audio recordings. Therefore, work-product protection is triggered, but that is not the end of the analysis.

### B. Exception to Work Product

Although the Court has found that the audio recordings are shielded by work product, Movants argue, in the alternative, that an exception applies. Under Rule 26(b)(3)(A), materials protected work-product are discoverable if (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. Igel does not argue that the audio recordings are not otherwise discoverable under Rule 26(b)(1), (*see* Doc. 250 at 10), and the Court finds they are relevant to Movant's claims and proportional to the needs of the case.

Fed. R. Civ. P. 26(b)(1). The exception, therefore, turns on whether Movants have shown substantial need for the audio recordings and undue hardship to obtain their substantial equivalent by other means.

Movants assert the disclosure of the audio recordings is essential to the preparation of their case, and they are simply unable to obtain substantially equivalent "fresh" information. (Doc. 260 at 5). When questioned at their depositions regarding the substance of the recorded interviews, Mary So, Tony Tomaro, Bryce Shaw and Rick Delozier all offered conflicting testimony regarding who was present during the audio recordings or otherwise could not recall the substance of the interviews. (Doc. 239-3, So Dep., 40:1–24; Doc. 239-5 Shaw Dep., 173:17–21; Doc. 239-6, Tomaro Dep., 161:2–6, 161:24–162:8; Doc. 239-7, Delozier Dep., 164:1–17). Movants represent that they "could not have deposed these witnesses prior to the commencement of discovery after filing suit and were not able to take all of their depositions until about 45 months after the incident." (Doc. 260 at 8). Further, they state the audio recordings are of "not just peripheral witnesses, they are [of] the key witnesses in the case on a central issue[]" as they "are the very individuals involved in the excavation around the bridge piers." (Doc. 260 at 6).

"Substantial need consists of the relative importance of the information in the documents to the party's case and the ability to obtain that information by other means." *Stampley v. State Farm Fire & Cas. Co.*, 23 F. App'x. 467, 471 (6th Cir. 2001). The party seeking work-product material must show "that it has no other way of obtaining the 'information' the reports contain, not just that it has no other way of obtaining the reports themselves." *South Fifth Towers, LLC v. Aspen Inc. UK, Ltd.*, No. 18-5440, 2019 U.S. App. LEXIS 3939, at *8–9 (6th Cir. Feb. 8, 2019). Faulty memory may tend to show "substantial need" justifying an exception to the work product

privilege. *Stampley*, 23 F. App'x at 471.

Here, the information contained in the audio recordings directly relates to Igel's work around the Bridge, an issue central to the case. The witnesses gave different accounts of who was in the room, how long the interviews lasted, and specific details of what was said. Igel admits that the purpose of taking the audio recording was to get an account of the facts while "fresh." Movants did not have an opportunity to interview the witnesses soon after their work on the Bridge, because the litigation did not commence until over one year after. *See Stout v. Norfolk & W. Ry. Co.*, 90 F.R.D. 160, 162 (S.D. Ohio 1981) (concluding that statements' "contemporaneity renders them so unique and unduplicable that need and hardship are clearly established"). The deposition testimony shows Movants cannot obtain this "fresh" information given the substantial time that has passed and the declarants' memory has faded. *See Stampley*, 23 F. App'x at 471. Accordingly, Movants have shown substantial need for the audio recording and undue hardship in acquiring equivalent information, so the exception to work-product applies.

### C. Other Discovery

Igel states the following with respect to Plaintiff's Motion to Compel responsive documents to Plaintiffs' Third Set of Requests for Production of Documents:

> As to [Plaintiff's Third Set of Requests for Production of Documents], Igel has already agreed to provide all non-privileged responsive documents. Igel has been working in good faith to produce the documents requested, but the sheer volume of documents received from the client has made review for privilege concerns a time-consuming task. Therefore, Igel agrees to provide responses and responsive documents, and requests that this portion of the Motion be held in abeyance pending Igel's production of responses.
>
> . . .
>
> As stated above, Igel has no objection to providing all non-privileged documents responsive to Plaintiffs' Third Set of Requests for Production. Igel has been

13

endeavoring in good faith to provide these documents in a timely fashion. The documents received by counsel from Igel were voluminous, meaning that the privilege review is taking longer than it would normally take, but again, Igel is working hard and in good faith to fulfill its discovery obligations. Igel therefore requests that this portion of the Motion to Compel be held in abeyance pending Igel's production of responses.

(Doc. 250 at 3, 10–11). Igel, therefore, does not refute it has an obligation to produce the outstanding discovery. Given the numerous extensions of the discovery deadline, the Court finds Igel's justifications lacking and expects its diligence in producing all remaining materials.

**IV. CONCLUSION**

For the foregoing reasons, Movants' Motions (Docs. 239, 240, and 242) are **GRANTED.** Igel is **ORDERED** to produce the audio recordings of Mary So's interviews of employees Tony Tomaro, Bryce Shaw, and Rick Delozier within seven days of the entry of this order. Igel is further **ORDERED**, within seven days of the entry of this order, to either: 1) produce the outstanding discovery, or 2) provide the Court with a status report identifying the outstanding discover and providing a timeline by which it plans to produce it.

IT IS SO ORDERED.


Date: April 22, 2019                          /s/ Kimberly A. Jolson
                                              KIMBERLY A. JOLSON
                                              UNITED STATES MAGISTRATE JUDGE